Herman C. PAGE, Petitioner,

v.

STRUCTURAL WOOD COMPONENTS, INC., Respondent.

No. 01–1122.

Supreme Court of Texas.

Argued Oct. 23, 2002.

Decided April 3, 2003.

terminated, we hold that the affidavit was not timely filed. Consequently, we reverse the court of appeals' judgment and render judgment that the subcontractor take nothing.

John M. Young, Law Office of John M. Young, Houston, for Petitioner.

Kenneth A. Keeling, James Elmore Hudson, III, Keeling Hudson LLC, Houston, for Respondent.

Chief Justice PHILLIPS delivered the opinion of the Court, in which Justice HECHT, Justice OWEN, Justice O'NEILL, Justice SCHNEIDER, Justice SMITH, and Justice WAINWRIGHT joined.

Chapter 53 of the Property Code permits a construction subcontractor to claim a lien on funds retained by the owner if the subcontractor "(1) sends the notices required by this chapter in the time and manner required; and (2) files an affidavit claiming a lien not later than the 30th day after the work is completed." TEX. PROP. CODE § 53.103. In this case, the owner terminated the general contractor and hired other contractors to complete the project. The question before us is when, in fulfilling the affidavit requirement of the statute, "work" is completed. The subcontractor here filed its affidavit thirty-one days after the original contract was terminated but well before subsequent contractors finished the project. The court of appeals held that work is completed when the requirements of the initial contract are finished, either by the first contractor or by subsequent contractors. 57 S.W.3d 524. Because we conclude that work must be defined in relation to a particular contract, and that the work under that contract was completed when the contract was

I

In 1997, Herman C. Page hired Mark Sepolio as general contractor on a $300,000 remodeling and expansion project for a building that Page owned in Houston. Sepolio in turn hired several subcontractors, including Structural Wood Components, Inc. (Structural Wood), to provide labor and materials. Structural Wood completed its portion of the job in mid-March, 1998. As work progressed on the construction, Page made periodic payments to Sepolio totaling $270,000. Before the project was finished, however, Page and Sepolio quarreled over the work, and Sepolio requested additional funds to finish the project. Page refused, and on April 14, 1998, he terminated Sepolio's contract. Page then hired six new contractors to finish the construction. Without hiring additional subcontractors, the new contractors completed the project on July 21, 1998, for a total payment of $27,074.43.

Meanwhile, because Sepolio failed to pay in full for its labor and materials, Structural Wood filed an affidavit claiming a lien on the property on May 15, 1998, thirty-one days after Page terminated the contract with Sepolio. Structural Wood subsequently filed suit to foreclose on its lien. After a bench trial, the trial court concluded that the work was completed on July 21, 1998, when the replacement contractors finished the project. The trial court held Sepolio and Page jointly and severally liable to Structural Wood for $11,861 in actual damages plus pre- and post-judgment interest and costs. The court further ordered foreclosure of the lien on Page's property and held Page individually

liable for $4,000 in attorney's fees. Page appealed and the court of appeals reformed the judgment to eliminate the foreclosure order, holding that no evidence supported the trial court's finding that Page had failed to retain ten percent of the contract price as required by section 53.101 of the Property Code. 57 S.W.3d at 529. However, based on section 53.103, the court of appeals upheld the personal judgment against Page, concluding that Structural Wood would still be entitled to a lien on retained funds as long as the lien affidavit was timely filed. *Id.* at 531–32. Like the trial court, the court of appeals interpreted the statutory definition of completion as the date when the additional contractors finished the project in July 1998. *Id.*

## II

■ The Texas Property Code requires owners to retain either "10 percent of the contract price of the work to the owner" or "10 percent of the value of the work … using the contract price or, if there is no contract price, using the reasonable value of the completed work" for "30 days after the work is completed." TEX. PROP.CODE § 53.101. These retained funds "secure the payment of artisans and mechanics who perform labor or service," including subcontractors such as Structural Wood. *Id.* § 53.102. A subcontractor or other claimant who wants to make a claim on that retainage must properly give notice and file "an affidavit claiming a lien not later than the 30th day after the work is completed." *Id.* § 53.103. The period during which a claimant can and must file a lien affidavit under section 53.103 is therefore the same period that an owner can and must hold retainage under section 53.101—thirty days after the completion of work. It is consequently in the best interest of all construction participants to know when the thirty-day period terminates—the owner so that it can release the remaining funds, the original contractor so that it can budget for its final payment, and the claimant so that it can file the lien affidavit before that date.

To determine when the thirty-day period ends, we look to the statutory definitions of "work" and "completion of an original contract." The Property Code provides that " '[c]ompletion' of an original contract means the actual completion of the work, including any extras or change orders reasonably required or contemplated under the original contract…." TEX. PROP.CODE § 53.001(15).[1] The Code defines "work" as "any part of construction of repair performed under an original contract." TEX. PROP.CODE § 53.001(14). The parties' statutory interpretations focus on different words within these definitions.

■ Page focuses on the phrase "under an original contract"[2] and contends that work under an individual contract should

---

1. At the time this dispute arose, this definition was found in 53.106(e). The statute was amended in 1997 to move the definition of " 'completion' of an original contract" to Property Code § 53.001(15). For clarity, we refer to the current section 53.001(15).

2. The dissent is premised on the notion that "Sepolio's contract *was* the original contract and that all the work done was work contemplated under that contract…." 102 S.W.3d at 730. "Original contract" does not mean the contract as originally written, however. Rather, the Property Code defines "original contract" as "an agreement to which an owner is a party either directly or by implication of law." TEX. PROP.CODE § 53.001(6). An amended contract can therefore be an "original contract" under the statute, and the owner may enter into a number of "original contracts" with different contractors. In this case, Page had at least seven original contracts: one with Sepolio and at least six with the replacement contractors.

be deemed completed when the contract is terminated or abandoned. He argues that just as a contract's retainage amount will change when the contract price is later modified, so too should the retainage period change when the work is modified. Page argues that the work contemplated under a contract is necessarily completed when a contract is terminated, as no additional work is contemplated under that contract.

Structural Wood focuses on the word "contemplated" and counters that because the statute requires "actual completion of the work ... reasonably required or contemplated under the original contract," a court should determine completion based on when all the work initially contemplated under the original contract is finished. In this case, the original contract contemplated the remodeling and expansion of the building, so the lien affidavit could be filed at any time within thirty days of the project's completion. In accepting this interpretation, the court of appeals noted that the statute did not "specify that the work only be done by the contractor who started it, as opposed to a substitute contractor." 57 S.W.3d at 531. Structural Wood argues that the alternative interpretation urged by Page works a hardship on subcontractors, who must file their lien affidavits in a shorter time and who may not know if an owner has terminated the general contractor. Structural Wood posits that only its approach comports with the requirement that courts interpret the mechanic's lien statute liberally in order to protect lien claimants. *See, e.g., First Nat'l Bank v. Sledge,* 653 S.W.2d 283, 288 (Tex.1983).[3]

Although there are strong arguments supporting both interpretations, we conclude that the greater weight of authority supports Page's contention that the work ends when a contract is terminated. The history of the mechanic's lien statute demonstrates the Legislature's intent to make retainage requirements dependent on individual contracts. A previous version of the mechanic's lien statute phrased the retainage requirement as:

> ten per cent (10%) of the contract price to the owner ... of such work, or ten per cent (10%) of the value of same, measured by the proportion that the work done bears to the work to be done, using the contract price or, if none, the reasonable value of the completed work as a basis of computing value.

Act of June 17, 1961, 57th Leg., ch. 382, § 9, 1961 Tex. Gen. Laws 869 (repealed 1983) (current version at TEX. PROP.CODE § 53.101). In *Hayek v. Western Steel Co.,* 478 S.W.2d 786, 792 (Tex.1972), the Court interpreted this language to mean that the owner must retain ten percent of the project's cost regardless of how many individual construction contracts were awarded. Therefore, we held that a subcontractor who had supplied steel and concrete to the foundation contractor could bring a retainage claim not just for ten percent of the value of the foundation contract, but rather

---

3. The dissent observes that "[w]e must not forget that the mechanic's and materialman's lien statutes are meant to protect the *subcontractor,* not the general contractor." 102 S.W.3d at 731 (emphasis in original). However, the statute is not designed to protect only subcontractors. Rather, we have held that "the mechanic's and materialman's lien statutes of this State will be liberally construed for the purpose of protecting laborers and materialmen." *First Nat'l Bank v. Whirlpool Corp.,* 517 S.W.2d 262, 269 (Tex.1974). Although the lien claimant in this particular case is a subcontractor, general contractors may also provide labor and materials. Consequently, we cannot ignore the effect of our interpretation on general contractors; we must consider the statute as it applies to all laborers and suppliers of material.

for ten percent of the entire cost of building the home. *Id.*

The Court's decision in *Hayek* focused on protecting lien claimants who might need to share in the retainage fund, based on the Legislature's "broad extension of protection and sharing in this fund to a new class of persons (materialmen)." *Id.* at 793. However, the Legislature determined that *Hayek* placed too great a burden on owners and original contractors by creating "an unreasonable retainage requirement on owners who enter into original contracts." Act of May 16, 1973, 63rd Leg., ch. 96, § 3, 1973 Tex. Gen. Laws 215 (repealed 1983) (current version at Tex. Prop.Code § 53.001). In response, the Legislature amended the statute at its next regular session. The bill analysis stated that the "original intent of the legislation was for the 10% retainage requirement to apply to each individual contract, not the total cost of the job" and that the bill's purpose was to "carry out the intent of the original legislation which created the 10% retainage requirement by limiting the 10% to each individual contract...." House Comm. on Judiciary, Bill Analysis, Tex. H.B. 1059, 63rd Leg., R.S. (1973). The new language added references to "an original contract" in the definitions of "work" and "contract price." "Work" was defined as "any construction or repair ... which is performed pursuant to an original contract," and "contract price" was defined as "the cost to the owner for any construction or repair ... which is performed pursuant to an original contract." Act of May 16, 1973, 63rd Leg., ch. 96, § 2(d), 1973 Tex. Gen. Laws 214 (repealed 1983) (current version at Tex. Prop.Code § 53.001).

Focusing on the work initially contemplated may give a subcontractor more time to perfect a lien, but it may also greatly delay payment for contractors in general. As Justice Walker pointed out in his *Hayek* dissent, focusing on the entire project instead of the individual contracts means that a contractor "who has fully performed by constructing the foundation of the building ... cannot be paid in full until 30 days after the painting contractor has finally completed the last work on the building. This may be several years after the work of the foundation contractor was completed." *Hayek,* 478 S.W.2d at 797 (Walker, J., dissenting). Under Structural Wood's interpretation of the current statute, an owner who terminated a general contract before the construction project was completely finished would not have to release the ten percent retainage until thirty days after all the new contractors finished the job. Even if an economic downturn postponed completion for years, the terminated general contractor could not claim its final payment until the project was later completed. Such an indefinite delay in payment is, we believe, exactly what the Legislature was trying to prevent when it added references to "an original contract" in its definitions of "contract price" and "work." *See* Tex. Prop.Code § 53.001(1), (14).

Hardship caused by the possibility of such delay would not be limited just to general contractors, but would also affect lien claimants generally. A longer retainage period would give potential lien claimants a longer time in which to file their affidavits, but would also delay a lien claimant's ability to enforce a lien on the owner's retainage. A subcontractor who had finished its work early—for example, the subcontractor who laid the foundation for a building—would take little comfort in having an extended period in which to claim a lien on the owner's retained funds if those funds were retained for many months or years.

Nor do we agree with Structural Wood's contention that subcontractors need to be

able to rely on the work initially contemplated under the original contract in order to know when the thirty-day period begins to run. Under our interpretation, it is true that a subcontractor would not be able to rely on a visual examination of the worksite in order to determine whether the work has been completed. A subcontractor who viewed a half-completed project and assumed that the lien affidavit was not yet due would run the risk that the general contract had been terminated and that the affidavit deadline had passed. But mere visual examination may not be enough under either interpretation. To borrow the analogy from the *Hayek* dissent, even under Structural Wood's interpretation a foundation subcontractor would likely have no way to know when an interior-painting subcontractor finished painting, and therefore would not know when the work contemplated by the general contract was finished. Recognizing this hardship, a recent treatise noted that "[i]n many situations, it is difficult to ascertain when all the work is actually completed; therefore, prudent claimants will file their lien no later than 30 days after the date they have finished their own work on the job site." STERLING W. STEVES & BRENDA T. CUBBAGE, THE COMPLETE GUIDE TO MECHANIC'S & MATERIALMAN'S LIEN LAWS OF TEXAS § 3.8.[1] at 3–26 (4th ed.2002). Subcontractors who follow this precaution and file the lien affidavit within thirty days of completing their own work will remain fully protected, even if the general contract is terminated or abandoned.

■ Finally, the dissent emphasizes that the Legislature's "definition of 'completion' does not include any reference to whether a contract is abandoned or terminated [but] simply defines 'completion' as 'actual completion.'" 102 S.W.3d at 728. However, the Legislature did not define the word "completion" by itself; rather, it defined the phrase " 'completion' of an original contract." TEX. PROP.CODE § 53.001(15). Moreover, the Legislature specified that the term "includ[es] any extras or change orders reasonably required or contemplated" by the contract. *Id.* Thus, if the parties add additional work to the contract, the original contract will not be completed until that work is also completed. Likewise, if the parties scale back a project, the original contract will be completed when the reduced work is completed. If the owner or the contractor terminates the contract, then no additional work can be contemplated under that original contract.

The mechanic's lien statute recognizes that construction contracts often change as a project progresses. As one commentator has observed, the retainage requirement is calculated "upon the contract price, as the same may be adjusted from time to time." 1 ELDON L. YOUNGBLOOD, YOUNGBLOOD ON TEXAS MECHANICS' LIENS, § 803.1[b] at 8–20 (2d ed.1999). While the retainage may be adjusted upward if additional work is added to the contract, the price may also be adjusted downward. Further, the commentator recognizes that terminated contracts are not uncommon; he writes that "[o]ne eventuality that usually adjusts the contract price and, commensurately, the amount of required retainage, is the abandonment of the work by the original contractor." *Id.*

Texas courts have long recognized that contract modifications—including termination—can change the amount of funds required to be retained under the contract. *See, e.g., McKalip v. Smith Bldg. & Masonry Supply, Inc.,* 599 S.W.2d 884, 885–87 (Tex.Civ.App.-Waco 1980, writ ref'd n.r.e.); *Dowdy v. Hale Supply Co.,* 498 S.W.2d 716, 721–22 (Tex.Civ.App.-Fort Worth 1973, no writ). It is therefore consistent to say that contract modifications can also

change the work contemplated by the contract, and, by implication, the retainage period. When a contract is terminated, courts have modified the retainage requirement to require retainage of ten percent of the value of the work prior to termination, recognizing that no further payments are contemplated under a terminated contract. *See, e.g., Dowdy,* 498 S.W.2d at 722. Likewise, no future work is contemplated under a terminated contract, and we therefore conclude that "completion of work" includes a situation in which the initial contract is terminated.

Finally, we note that the Legislature has recently mandated that contractors provide a "disclosure statement" to homeowners engaging in residential construction projects. TEX. PROP.CODE § 53.255. The disclosure statement is not applicable in this case, as Page hired Seoplio for a commercial, not a residential, project. Nevertheless, the disclosure statement offers guidance because it provides a plain-English description of an owner's retainage duties under the mechanic's lien statute, and these duties are the same in both residential projects and commercial projects. *See* TEX. PROP.CODE § 53.101. The disclosure statement informs the owner that: "During construction and for 30 days after final completion, termination, or abandonment of the contract ... you should withhold or cause your lender to withhold 10 percent of the amount of payments made for the work performed by your contractor. This is sometimes referred to as 'statutory retainage.'" TEX. PROP.CODE § 53.255(b). The Legislature's description of the statutory retainage requirement indicates that the Legislature did not intend to require an owner to hold on to the statutory retainage for more than thirty days after the contract's termination.

### III

We conclude that the construction contract and the work performed thereunder are complete at the time that the contract is terminated or abandoned, so that the lien affidavit must therefore be filed within thirty days of the contract's termination. Thus, we hold that Structural Wood's affidavit was not timely filed in this case, as it was filed thirty-one days after Page terminated Sepolio's construction contract. We accordingly reverse the court of appeals' judgment and render judgment that Structural Wood take nothing against Page.

Justice ENOCH filed a dissenting opinion, in which Justice JEFFERSON joined.

Justice ENOCH filed a dissenting opinion, in which Justice JEFFERSON joined.

Because I agree with the court of appeals that Structural Wood was not required to file its lien until thirty days after the work contemplated under the original Sepolio contract was *actually* completed, I respectfully dissent.

### I

Structural Wood Components, Inc. was a subcontractor who provided supplies to Mark Sepolio. Sepolio was a general contractor who agreed to do some remodeling work for Herman C. Page. Following a payment disagreement, Page terminated Sepolio's contract on April 14, 1998, and hired other contractors to finish the work he had originally contracted with Sepolio to do. The work was finally completed on July 21, 1998. Because Sepolio never paid Structural Wood for the materials and labor it provided, Structural Wood filed a mechanic's and materialman's lien on May 15, 1998. In compliance with statutory

requirements,[1] Structural Wood sent Page notice of its claim on May 15, 1998, and a copy of the filed lien affidavit on May 18, 1998. Page claims that Structural Wood did not timely file its lien affidavit because when Page terminated Sepolio's contract on April 14, 1998, the work was deemed completed by that termination. Page contends that the lien affidavit should have been filed on or before May 14, 1998.[2] Structural Wood asserts that the work was not actually completed until July 21, 1998, and therefore, its lien affidavit was timely filed.

## II

The Texas Property Code requires that an owner retain ten percent of the contract amount during the time the work contemplated under an original contract is in progress, and for thirty days after the completion of the work.[3] The retainage statute requires that these funds be set aside specifically to ensure that subcontractors, artisans, mechanics, and others who supply material and perform labor are paid.[4] To have a valid lien against the retained funds, a subcontractor must meet only two requirements: "(1) send[ ] the notices required by this chapter in the time and manner required; and (2) file[ ] an affidavit claiming a lien not later than the 30th day after the work is completed."[5]

The statute defines "work" as "any part of construction or repair performed under an original contract."[6] An original contract is completed when the work is *actually completed*, "including any extras or change orders reasonably required or contemplated under the original contract, other than warranty work or replacement or repair of the work performed under the contract."[7]

When called upon to interpret the Texas mechanic's and materialman's lien statutes, recognizing that they "are not exactly a model of clarity,"[8] we liberally construe them to protect the artisan, the laborer, and the materialman.[9] But here, the language of the statutes in question is clear and unambiguous, and we need do no more than ascribe to them their ordinary meaning.[10] The words of this statute support Structural Wood's claim that it timely filed its lien affidavit, because it filed its affidavit well before the work was actually completed on July 21.

Page argues that the Legislature's "definition of 'work' clearly mandates that work under an original contract is completed when that original contract is abandoned or terminated," but he offers no authority to support this "clear" mandate. Instead, he cites statutory language that reads as follows:

Indebtedness to an original contractor accrues: (1) on the last day of the month in which a written declaration by the original contractor or the owner is received by the other party stating that the original contract has been terminat-

---

1. TEX. PROP.CODE §§ 53.055, 53.056.

2. *See id.* § 53.101.

3. *Id.*

4. *Id.* § 53.102.

5. *Id.* § 53.103.

6. *Id.* § 53.001(14).

7. *Id.* § 53.001(15).

8. *First Nat'l Bank v. Sledge,* 653 S.W.2d 283, 286 (Tex.1983).

9. *See Indus. Indem. Co. v. Zack Burkett Co.,* 677 S.W.2d 493, 495 (Tex.1984) (per curiam); *First Nat'l Bank,* 653 S.W.2d at 288.

10. *See State v. Gonzalez,* 82 S.W.3d 322, 327 (Tex.2002).

ed; or (2) on the last day of the month in which the original contract has been completed, finally settled, or abandoned.[11]

This provision does not in any way refer to when work is completed; it merely establishes the point in time from which the owner's indebtedness to the original contractor accrues. The provision is not definitional. Furthermore, the mechanic's and materialman's lien statute does provide a definition of completion of work contemplated under a contract. And the Legislature's definition of "completion" does not include any reference to whether a contract is abandoned or terminated. It simply defines "completion" as "actual completion."[12]

The Eleventh Court of Appeals considered this same issue—when work is considered completed for purposes of perfecting a retainage lien—in *TDIndustries, Inc. v. NCNB Texas National Bank*.[13] In that case, a subcontractor filed a retainage lien against the bank. The bank claimed that the lien had not been timely filed. The court of appeals, however, held that even though an architect certified completion at the beginning of January, the work was not actually completed until the end of February when a pocket door required under the original construction contract was finally installed.[14] Because the term "completion" was both legislatively defined and unambiguous, the court of appeals literally construed the term " 'actual completion,' . . . according to the rules of common usage."[15] Installation of the pocket door

was work required under the original contract, and therefore, the work was not actually completed until that pocket door was installed.[16]

The Eleventh Court of Appeals' reasoning is persuasive. Defining "actual completion" to mean "actual completion" is the only way to ensure that every subcontractor under an original construction contract is protected:

> If, for example, the subcontractor who had installed the pocket door were [sic] not paid for his work, he should be entitled to the security of a ten percent retainage fund measured by the full contract price of the original contract. Yet, if the time for filing his lien affidavit had already run at the time when he completed his work, he would have been divested of his rights . . . through no fault of his own. There is no escaping the conclusion that "completion" means the *performance of the last item of compensable and lienable work that is contemplated by the original contract.*[17]

The statute requires *actual* completion of the work, work being "any part of construction or repair performed under an original contract."[18] The workers hired by Page were not hired to perform work different or unrelated to the remodeling work contemplated under the original contract. They were hired to complete the parts of construction or repair that were contemplated under Sepolio's original contract but left unfinished.

---

11. Tex. Prop.Code § 53.053(b).

12. *Id.* § 53.001(15).

13. 837 S.W.2d 270 (Tex.App.-Eastland 1992, no writ).

14. *Id.* at 272.

15. *Id.*

16. *Id.*

17. 1 Eldon L. Youngblood, Youngblood on Texas Mechanics' Liens, § 803.6[a] (1996) (emphasis added).

18. Tex. Prop.Code § 53.001(14).

Page has persuaded the Court to hold that "actual completion" doesn't really mean "actual completion," and that the meaning of the term should be enlarged to include abandonment or termination of a contract. But that we cannot do. We cannot define completion differently from the Legislature.[19] As Page himself points out, we are bound by the statutory language: "[T]he courts, possessing no legislative powers, may not enlarge or alter the plain meaning of statutory language. Wording in statutes is to be given its literal interpretation when that wording is clearly unambiguous."[20] Our duty here is to apply the words of the statute. The Court today takes an unambiguous, ordinary phrase, alters its meaning, and turns it into a legal term of art. For no longer does "actual completion" mean "actually completed;" it now means "actually completed"—but not really because if the work is not actually completed, but is abandoned or terminated, that also means that it has been actually completed.[21] This cannot be. The Legislature has provided the definition of completion in clear, unambiguous terms. This Court often complains of the lack of clarity in legislative pronouncements.[22] In the face of legislative clarity, it is incomprehensible that today, the Court sabotages an ordinary, unambiguous phrase by infusing it with counterintuitive shades of meaning.

The original contractor, Sepolio, never completed the work required under the original contract. That work had to be finished by others. The other contractors were not doing warranty work, and they did not replace or repair the work Sepolio had already performed. They merely finished the job originally contemplated under Sepolio's contract. The work was not actually completed when Page terminated Sepolio's contract on April 14. The work was actually completed on July 21. Structural Wood timely filed its lien.

### III

The Court points out that legislative history "demonstrates the Legislature's intent to make retainage requirements dependent on individual contracts."[23] In *Hayek v. Western Steel Co.*,[24] we held that the ten percent retainage requirement meant ten percent of the entire project. One year after *Hayek* was decided, the Legislature rejected the holding in that case, and amended the lien statutes so that the retainage requirement would apply to each individual contract, rather than the cost of the project as a whole.[25]

19. *See Ryan v. Travelers Ins. Co.*, 715 S.W.2d 172, 175 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.) (stating that when a statute substantially modifies common law rights, the statute entirely controls the rights and obligations of the parties to an action brought under that statute).

20. *Conn, Sherrod & Co. v. Tri–Elec. Supply Co.*, 535 S.W.2d 31, 34 (Tex.Civ.App.-Tyler 1976, writ ref'd n.r.e.).

21. *See* 102 S.W.3d at 725.

22. *See Lawrence v. CDB Servs., Inc.*, 44 S.W.3d 544, 549 (Tex.2001); *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 584 (Tex. 1996); *Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30, 32 (Tex.1983); *Lowe v. Tex. Tech Univ.*, 540 S.W.2d 297, 301 (Tex.1976) (Greenhill, C.J., concurring); *see also* Chief Justice Thomas Phillips, State of the Judiciary Address (March 4, 2003), *available at* http://www. supreme.courts.state.tx.us/Advisory/SOJ.pdf.

23. 102 S.W.3d at 723.

24. 478 S.W.2d 786, 793 (Tex.1972).

25. *See* HOUSE COMM. ON JUDICIARY, BILL ANALYSIS, Tex. H.B. 1059, 63rd Leg., R.S. (1973); *see also McKalip v. Smith Bldg. & Masonry Supply, Inc.*, 599 S.W.2d 884, 889 (Tex.Civ.App.-Waco 1980, writ ref'd n.r.e.) ("In our opinion the Legislature's Amendment of [the statute] was intended to and does have the effect of

Besides the fact that Sepolio's contract *was* the original contract and that all the work done was work contemplated under that contract, the amount of the retainage fund is not at issue here. Further, to the extent the amount of time the retainage fund is to be held by the owner is an issue, the statute tells us how long that must be—thirty days from the date the work is completed.[26] The statute then defines for us when the work is considered complete—when it is actually completed. The work contemplated under Sepolio's original contract was not completed until the substitute contractors were done.

The Court states that "Texas courts have long recognized that contract modifications—including termination—can change the amount of funds required to be retained under the contract. It is therefore consistent to say that contract modifications can also change the work contemplated by the contract, and, by implication, the retainage period."[27] What the Court fails to grasp is that there is no *implication* here. There are clear, unambiguous legislative directives concerning whether the owner must set aside an amount to ensure subcontractor payment, how much the owner must set aside, and for how long the owner must keep it set aside. The issue of the amount of the retainage is no more related to the question of how long an owner is required to retain the ten percent amount than it is to the question of *whether* the owner is required to retain the ten percent, even in the event the contract is terminated or abandoned.

The only thing that is affected by termination or abandonment is the amount the owner is required to retain:

> The owner may use unearned funds not yet paid to an original contractor in order to complete construction after the original contractor's abandonment ... But he is not relieved of his duties regarding statutory retainage. An owner cannot disregard a subcontractor's right that he retain ... merely because of the abandonment or default of the original contractor.[28]

It is not difficult to understand that the amount would necessarily be adjusted because the agreed-to work is never completed.[29] But termination or abandonment of a contract does not relieve an owner of the duty to retain ten percent of the contract price, nor does it change the owner's obligation to retain that amount during the pendency of the work and for thirty days after the work is actually completed.[30] Neither of those obligations is dependent upon the contract price; they are strict duties imposed by statute that cannot be altered or adjusted.

## IV

The Texas mechanic's and materialman's lien statutes do not focus on *who* does the work; they focus on whether and when the work is actually completed. The Court asserts that "[f]ocusing on the work initially contemplated may give a subcontractor more time to perfect a lien," but that doing so creates hardship for both the general contractor and other lien claimants because it might delay payment for a long

---

limiting the retainage fund ... to 10% of a particular original contract, in situations where there are multiple original contracts executed for the construction of a single project.").

**26.** Tex. Prop. Code § 53.101.

**27.** 102 S.W.3d at 725–26 (citations omitted).

**28.** Youngblood, *supra*, § 803.1[b].

**29.** *Id.*

**30.** *Id.*

period of time.[31] The Court misses the point. We must not forget that the mechanic's and materialman's lien statutes are meant to protect the *subcontractor*, not the general contractor. The subcontractor is a derivative claimant,[32] and the provisions governing the claims of derivative claimants, including the retainage lien provisions, are specifically distinguished from the provisions governing the rights and remedies of original contractors.[33] There is a reason for this. A leading expert on Texas mechanic's and materialman's liens points out that "[p]roperly characterizing the claimant as an original contractor or subcontractor is important because a subcontractor is not entitled to a constitutional lien, and it is relatively difficult for him to perfect a statutory lien."[34] There are other provisions in place to protect the general contractor.[35] "[A]n original contractor often has a constitutional lien automatically, and the manner of perfecting his statutory lien is relatively simple."[36]

The Court gives as an example the foundation contractor who cannot get paid until the painting contractor finishes the painting. In the worst case scenario, if the foundation contractor and the painting contractor each had their own original contract, they would both be an original contractor, and would be entitled to their own rights and remedies.[37] Additionally, each would only have to wait thirty days after the work contemplated under his own orig-inal contract was completed to receive full payment, as long as each original contractor paid his subcontractors, and the subcontractors were not forced to file retainage liens.

If, on the other hand, the foundation contractor and painting contractor were *sub* contractors, hired by a general contractor, then they would both have thirty days from actual completion of the contract to file their liens if the general contractor did not pay them, just as the retainage statute contemplates. It is difficult to envision a scenario where the general contractor would be paid in full in any event before he completely finishes the work he agreed to do under the original contract. And once that work is actually completed, the general contractor only has to wait thirty days before he is paid in full—and that will happen as long as he has paid his subcontractors, and there are no outstanding retainage liens. Again, the retainage lien statute was enacted to protect the unpaid *sub* contractor, not the general contractor.

The Court's concern over owners' and original contractors' hardship is misplaced, or at the very least, skewed in the wrong direction, considering the purpose of the statute. Requiring a subcontractor to know if the particular original contract under which he has been supplying materials or labor has been terminated or aban-

---

31. 102 S.W.3d at 724.

32. *See* Eldon L. Youngblood, *Mechanics' and Materialmen's Liens in Texas,* 26 Sw. L.J. 665, 670–71 (1972).

33. *See, e.g.,* TEX. PROP.CODE § 53.056 (notice requirements for derivative claimant to original contractor or owner); § 53.057 (derivative claimant's notice for contractual retainage lien); § 53.024 (limitation on subcontractor's lien).

34. Youngblood, *supra,* at 671 (citations omitted).

35. *See, e.g.,* TEX. PROP.CODE § 53.053 (accrual of indebtedness to original contractor).

36. Youngblood, *supra,* at 671 (citations omitted).

37. *See supra* notes 29–33 and accompanying text.

doned works a terrible inequity against the very persons the statute is intended to protect, particularly because the lien statute does not require the owner to notify the subcontractor of the termination or abandonment of the contract. The provision governing notification of completion is merely permissive.[38]

Moreover, particularly because the owner is in the best position to know the status of his or her own contract, placing the burden of risk on the subcontractor to know if the contract has been terminated creates the potential for an unscrupulous owner to terminate the contract without notice to the subcontractor, let the thirty days run, and then contract the work out to someone else to finish, thereby relieving himself of the otherwise valid encumbrance. As we pointed out above, the purpose of the mechanic's and materialman's lien statute is to protect laborers and materialmen, not to increase their burden and risk.

The Court suggests that a subcontractor can best protect himself by filing a lien affidavit within thirty days of the completion of his own work.[39] But it is not for this Court to legislate new requirements, particularly requirements that would expose owners to the risk of having an otherwise good title clouded with numerous, and largely unnecessary, lien claims. The Legislature has not required subcontractors to file their lien affidavit within thirty days of the completion of their own work; nor has the Legislature required owners to notify subcontractors if the contract with the general contractor is terminated. Absent such requirements, subcontractors must comply only with the current requirements of the statute. Those literal requirements direct lien claimants to file their liens within thirty days of *actual completion* of the work contemplated under the original contract.

Finally, it is ironic that the Court justifies its position—that "completion" implicitly includes "non-completion"—by pointing to *additional and express* statutory language used in a separate legislative enactment covering residential construction contracts.[40] First, this express language does not appear anywhere in the definition section of the mechanic's and materialmen's lien statutes,[41] or in the retainage lien statute itself,[42] which is a rather obvious point of distinction. Second, it is rather bold for the Court, nevertheless, to assert that this additional and express language in section 53.255 demonstrates that the Legislature intended that non-completion by abandonment and termination be implied within the definition of completion in section 53.001. To the contrary, it is undeniably more certain that the Legislature recognized that "completion" did *not* cover non-completion of the contract, and that it had to, therefore, expressly reference abandonment or termination *in addition to* actual completion in section 53.255. And tellingly, the Legislature only included this express language in the residential construction provisions, and not anywhere else in the retainage lien provisions. Most assuredly, had the Legislature intended non-completion to count anywhere else besides the residential construction retainage provisions, it would have expressly done so.

Because the Texas mechanic's and materialman's lien statute requires retainage lien claimants to file their lien affidavits

---

**38.** *See* TEX. PROP.CODE § 53.106.

**39.** 102 S.W.3d at 725.

**40.** 102 S.W.3d at 726.

**41.** *See* TEX. PROP.CODE § 53.001.

**42.** *See id.* § 53.101.

within thirty days of actual completion of the work contemplated under the original contract, I would affirm the court of appeals.