**Affirmed and Memorandum Opinion filed March 28, 2013.**



In the

# Fourteenth Court of Appeals

## NO. 14-12-00012-CV

**K&N BUILDER SALES, INC., Appellant**

**V.**

**DENNIS BALDWIN AND ROSELLA BALDWIN, Appellees**

**On Appeal from the 334th District Court
Harris County, Texas
Trial Court Cause No. 2009-64811**

## M E M O R A N D U M   O P I N I O N

Appellant K&N Builder Sales, Inc. (K&N) appeals the judgment from a bench trial in which the trial court concluded that the affidavit filed on behalf of K&N did not create a valid lien on appellees Dennis and Roselle Baldwin's property and awarded the Baldwins $11,141 in monetary damages. K&N argues that the trial court erred in finding that (1) K&N's affidavit claiming a lien was untimely filed; (2) the Baldwins were entitled to a judgment against K&N; and (3)

the contract between the Baldwins and the home builder GSG Builders, Inc. (GSG) was terminated on March 28, 2009. Because the record contains sufficient evidence to support the trial court's findings and judgment, we affirm.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The Baldwins contracted with GSG in February 2008 to build a home in Houston, Texas. The contract called for a total amount of payments to GSG of $1,066,800, and for 10% retainage to be withheld from all payments to GSG. The Baldwins financed the contract with cash and also through a construction loan. On the Baldwins' behalf, the bank withheld the 10% retainage.

One of the subcontractors, K&N, supplied appliances to the project on March 18 and 25, 2009. GSG owed K&N $27,740.71 for these appliances. The Baldwins moved into the completed home on March 28, 2009. Facing financial difficulties, GSG failed to pay money owed to various subcontractors, including K&N. Once the Baldwins found out that GSG had not paid its subcontractors, the Baldwins requested that the bank release the retainage, which amounted to $111,102, into escrow with the title company for the benefit of the unpaid subcontractors.

On May 15, 2009, K&N filed an affidavit claiming a lien on the property. On June 5, counsel for the Baldwins sent a letter to the subcontractors GSG had not paid, including K&N, instructing them not to file liens on the property, and informing them that the Baldwins had complied with section 53.101 of the Texas Property Code to withhold 10% of the contract price for the benefit of subcontractors, that the statutorily-retained funds would be available on or after July 17, and that they would be receiving 61.29% of the funds they were due. The Baldwins' counsel also sent counsel for K&N a copy of the agreement paying the retainage into escrow. K&N refused to accept its pro rata share of the retained

funds ($17,002.28) and to release the lien. Because of K&N's lien on the property, the Baldwins were unable to secure refinancing in the form of a conventional mortgage and thus reduce their interest rate from 5.75% to 4.789%; they paid extra interest on their note in the amount of $11,141.

The Baldwins filed suit against K&N seeking a declaratory judgment, discharge of the lien, and special damages for slander of title. K&N filed a counterclaim seeking to foreclose its lien on the property. After a bench trial, the trial court issued findings of fact and conclusions of law.

The trial court issued findings of fact that GSG was paid all monies due under the contract with the Baldwins, except for the $111,102 retainage; the Baldwins moved into the residence on March 28, 2009; GSG performed no work at the Baldwin residence after March 28; the contract between the Baldwins and GSG was terminated on March 28; K&N filed an affidavit claiming a lien on the Baldwins' property on May 15; May 15 is more than 30 days after GSG completed its work on the Baldwins' residence and more than 30 days after the contract between the Baldwins and GSG was terminated; and the Baldwins have paid $11,141 in interest charges they would not have incurred but for the lien K&N placed on the residence.

The trial court issued conclusions of law that because the Baldwins complied with the retainage provisions of the Property Code, the extent of their liability to derivative claimants was limited to the retained amount, plus any funds that should have been trapped under the Code; with regard to the contract between the Baldwins and GSG, all work done under the contract was completed by March 28, and any remaining portion of the contract was terminated on that date; K&N did not file its affidavit claiming a lien within 30 days from the date construction was completed, or the original contract terminated, as required by section 53.103(2)(A)

3

and (B) of the Code, and therefore, K&N's filing did not have the effect of creating a valid lien on retainage; the Baldwins are entitled to a judgment declaring K&N's lien affidavit void and without effect; and the Baldwins are entitled to judgment against K&N in the amount of $11,141 for the wrongful lien on their real property.

The trial court signed a final judgment declaring that K&N's lien affidavit did not have the effect of creating a valid lien on the Baldwins' property or on the statutory retainage; ordering that the Baldwins have final judgment against K&N for actual damages of $11,141, plus pre- and post-judgment interest; and ruling that K&N take nothing on its counterclaims. K&N timely appealed.

## II.        APPLICABLE LAW

Section 53.101 of the Texas Property Code provides that "[d]uring the progress of work under an original contract for which a mechanic's lien may be claimed and for 30 days after the work is completed, the owner shall retain . . . 10 percent of the contract price of the work to the owner." TEX. PROP. CODE ANN. § 53.101 (West 2007). "The retained funds secure the payment of artisans and mechanics who perform labor or service and the payment of other persons who furnish material, material and labor, or specially fabricated material for any contractor, subcontractor, agent, or receiver in the performance of the work." *Id.* § 53.102. Section 53.103 provides:

> A claimant has a lien on the retained funds if the claimant:
>
> (1) sends the notices required by this chapter in the time and manner required; and
>
> (2) files an affidavit claiming a lien not later than the 30th day after the earlier of the date:
>
>> (A) the work is completed;
>>
>> (B) the original contract is terminated; or
>>
>> (C) the original contractor abandons performance under the

4

original contract.

*Id.* § 53.103; *see Page v. Structural Wood Components, Inc.*, 102 S.W.3d 720, 722–23, 726 (Tex. 2003) (holding that subcontractor's "affidavit was not timely filed in this case, as it was filed thirty-one days after [owner] terminated [general contractor]'s construction contract"). "[A] subcontractor's lien rights are totally dependent on its compliance with the statutes authorizing the lien." *First Nat'l Bank v. Sledge*, 653 S.W.2d 283, 285 (Tex. 1983).

### III.  STANDARD OF REVIEW

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's verdict on jury questions, and they are reviewable for legal and factual sufficiency by the same standards applied in reviewing evidence supporting a jury's answer. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). In determining if the evidence is legally sufficient, we must consider evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We must credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *Id.* The factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *See id.* at 819; *Kazmir v. Benavides*, 288 S.W.3d 557, 561 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *Barrientos v. Nava*, 94 S.W.3d 270, 288 (Tex. App.—Houston [14th Dist.] 2002, no pet.)). We will not disturb the trial court's findings if there is evidence of probative force to support them. *Kazmir*, 288 S.W.2d at 561 (citing *Barrientos*, 94 S.W.3d at 288). There is "no evidence" or legally insufficient evidence when the record shows one of the following: (1) a complete

5

absence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810.

## IV.    ANALYSIS

K&N presents three separate issues on appeal. First, K&N argues that the trial court erred in finding that K&N's lien affidavit was invalid due to being untimely filed. Second, K&N argues that the trial court erred in finding that the Baldwins were entitled to a judgment against K&N. In its third issue, K&N argues that the trial court erred in finding that the contract between the Baldwins and GSG was terminated on March 28, 2009.

### A. K&N's first and third issues

We construe K&N's both first and third issues to complain of the legal sufficiency[1] of the evidence to support the trial court's finding that "May 15, 2009

---

[1] *See Fid. Mut. Life Ins. Co. v. Kaminsky*, 768 S.W.2d 818, 820 (Tex. App.—Houston [14th Dist.] 1989, no writ) ("[T]his court determines whether a point challenges the legal or factual sufficiency of the evidence, or both, by analyzing both the wording of the point and the record references and argument under the point."). In its arguments under these two issues, K&N employs various phrases—"no actual evidence," "nor was there any evidence," "it is clear under the facts established," "evidence at trial showed to the contrary," "absolutely no evidence," "evidence clearly demonstrated," and "only evidence." Further, K&N in its prayer for relief requests only that the judgment be set aside and that this court enter a finding that K&N's lien is timely and proper, *i.e.*, reversal and rendering. *Compare Trenholm v. Ratcliff*, 646 S.W.2d 927, 933–34 (Tex. 1983) (construing reply point as legal sufficiency point where it stated judgment was correct because there was no evidence, and not permitting factual sufficiency review on appeal), *and Holley v. Watts*, 629 S.W.2d 694, 696 (Tex. 1982) (where issues attacked fact determinations without specifying legal or factual sufficiency, considering words in argument such as "compel the conclusion," "clearly demonstrative," and "most persuasive," and concluding this was legal sufficiency challenge), *with Pool v. Ford Motor Co.*, 715 S.W.2d 629, 632–33 (Tex. 1986) (interpreting complaint that trial court erred in rendering judgment because jury's finding is so against great weight and preponderance of the evidence as factual sufficiency challenge), *and Airway Ins. Co. v. Hank's Flite Ctr., Inc.*, 534 S.W.2d 878, 879–80 (Tex. 1976) (concluding point was factual sufficiency point, based on statements that jury findings were

is more than 30 days after GSG completed its work at [the home], and more than 30 days after the contract between GSG and the Baldwins was terminated." Based on this finding, the trial court concluded that K&N did not meet the 30-day filing requirement under section 53.103(2), and therefore that K&N's filing did not have the effect of creating a valid lien on retainage.

K&N argues that that the work was not completed more than 30 days before K&N filed its lien affidavit because there were invoices from vendors and subcontractors dated after March 28, allegedly showing that work was performed under the original contract as late as May 2009.[2] In support, K&N cites *TDIndustries, Inc. v. NCNB Texas National Bank*, an Eastland Court of Appeals case where the court held that the date of completion of work for purposes of section 53.101 was the day that a pocket door required by the original contract but omitted during construction was installed. 837 S.W.2d 270, 272 (Tex. App.— Eastland 1992, no writ).

*TDIndustries* retains little, if any, persuasive value regarding the meaning of completion of work because the Texas Supreme Court has since issued its opinion in *Page*, which defined completion of work to include when the original contract is terminated or abandoned, *see* 102 S.W.3d at 722–23, 726, and the legislature has since amended section 53.103 to harmonize this provision with *Page* by adding subsections (B) and (C) regarding contract termination or abandonment, *see* Act of May 24, 2005, 79th Leg., R.S., ch. 1003, § 1, sec. 53.103, Tex. Gen. Laws 3371.

against great weight and preponderance of the evidence, and requests that case be reversed and remanded). Thus, K&N's appellate issues present legal, not factual, sufficiency challenges.

[2] In its brief, K&N expressly accuses Mrs. Baldwin and Gobhold of picking March 28 as a "convenient date" and committing perjury. However, it is K&N that attempts to rely on, and included in an appendix to its brief behind the subcontractor statements and invoices actually admitted by trial exhibit, additional documents not in evidence before the trial court. Of course, we must limit our review to the "evidence at trial." *See City of Keller*, 168 S.W.3d at 827.

In any event, *TDIndustries* is distinguishable because there, the owner presented "no evidence to support the contention that the installation of the pocket door was warranty or repair work" and therefore did not fall within the meaning of "completion." 837 S.W.2d at 272. Here, both Mrs. Baldwin and GSG's former owner testified that even if any work related to the contract was performed after March 28, it was warranty work.

Here, Mrs. Baldwin testified she had "no doubt" that her family moved into the house on March 28, 2009. Mrs. Baldwin testified that they had to move out of their temporary corporate housing by March 28, and the family also hosted a birthday party at the house "that last weekend in March." The house "was complete" on the day that the Baldwins moved in. Mrs. Baldwin also testified that after the Baldwins moved in, GSG did no other work at the property, nor did any subcontractors do any work, other than warranty work. Mrs. Baldwin testified that any additional work that took place after they moved into the house, including some painting, electrical, and lighting work, was paid for "out of [her] own pocket." She testified that nothing was done to the property after March 28 that was "within the contract with [GSG]." Mrs. Baldwin testified that all the landscaping and interior decorating under the contract was "already done" and "already paid" by the time they moved in on March 28. When presented with the post-March 28 statements, Mrs. Baldwin testified that no plumbing work was done after March 28; that if electrical items were supplied in April, that work was pursuant to warranty or was paid for by the Baldwins; and that labor to adjust kitchen cabinets reflected on an invoice was performed prior to March 28.

Gilbert Gobhold, former owner of the now-defunct GSG, testified that GSG was "totally done" with the Baldwins' house by the time they moved in on March 28. Gobhold further testified that he was personally aware of the state of the

8

Baldwins' house on the date that they moved in, and that "it was done." Gobhold reviewed the defense's exhibit containing subcontractor invoices dated after March 28 and stated that he was "certain" and "personally kn[e]w" that all this work, including cabinet and wood-floor work, was "already done" and "completed" by the date the Baldwins moved into the house. Gobhold testified that he "very carefully walked through the Baldwins' house several times a day before they moved in" and he knew "everything was there" with regard to plumbing fixtures. Gobhold admitted it was possible that some of the plumbing invoices related to another GSG project that had still been in progress. Gobhold testified that with regard to a particular electrical invoice, he knew that the invoice date represented "[t]he date that it was charged," not "work that was done on that date." Gobhold further testified that some of the invoices were actually statements that simply recapped previous outstanding invoices. Gobhold also testified that some of his subcontractors do not use paper invoices and instead just tell him what they are owed, and thus for them it was a different situation here when the Baldwins' counsel asked Gobhold to have the unpaid subcontractors forward "whatever invoices they thought needed to be paid."

Regarding the date of contract termination, while K&N acknowledges Mrs. Baldwin's testimony regarding firing her builder, K&N contends, without citation to any authority or specific citation to the record, that the Baldwins were required to provide "written notice of termination or an[] accounting that the contract was terminated" to demonstrate contract termination.

Here, with regard to whether everything that was required under the contract actually had been done by GSG, Mrs. Baldwin stated, "If it wasn't done by then, we were done with [GSG] when [we] moved in." Mrs. Baldwin also testified that she fired GSG on the day the Baldwins moved in and "asked [Gobhold] to not

9

come back," and stated, "I don't know if it is a legal term, whatever, but we were done with him." Mrs. Baldwin testified that by her actions, she understood that she was terminating the agreement between the Baldwins and GSG.

Gobhold testified that on the day the Baldwins moved in, they told him that GSG was "done" working on their home and they did not want GSG's project manager, Doug Anderson, to return. Gobhold further testified to his understanding that when the Baldwins said GSG was "done" that the Baldwins meant they were "terminating" or "completing the contract." Although Gobhold admitted Anderson "may" have returned to the Baldwins' house, it involved a "warranty issue" and at that point Anderson was no longer employed by GSG.

As the sole trier of fact, the trial court reasonably was entitled to credit Mrs. Baldwin's and Gobhold's direct testimony regarding the status of completion of work under the contract between the Baldwins and GSG at the time the Baldwins moved in. The trial court reasonably was entitled to credit Mrs. Baldwin's and Gobhold's direct testimony regarding that all the work reflected in the subcontractors' post-March 28 invoices was completed as of March 28, and Gobhold's explanations as a general contractor regarding why those invoices were dated beyond March 28. Consistent with Gobhold's explanations, K&N's own statement submitted to the Baldwins in connection with its notice of lien is dated May 11; there is no dispute that K&N delivered its appliances to the Baldwins' house prior to March 28. Moreover, K&N presented no controverting testimony from any of the subcontractors that allegedly performed work after March 28. *See Kazmir*, 288 S.W.3d at 562–63 (concluding that "the trial court could not ignore appellees' undisputed testimony that was clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and which could have been readily controverted").

The trial court also reasonably was entitled to credit the direct testimony from both Mrs. Baldwin and Gobhold of their understanding that their contract was terminated on March 28. Moreover, K&N has provided, and we have located, nothing in the Property Code or its case law, or in the contract between the Baldwins and GSG, or otherwise, that requires any written notice or accounting to terminate, or to prove such termination for purposes of section 53.103.[3]

The 30-day clock for a claimant to file an affidavit on retained funds starts on the "*earlier* of the date . . . the work is completed [or] the original contract is terminated." TEX. PROP. CODE ANN. § 53.103 (emphasis added). The Texas Supreme Court recognizes this filing requirement imposes a "hardship" on subcontractors that likely will not be able to know when the 30-day period begins to run. *See Page*, 102 S.W.3d at 725. Nevertheless, even filing one day late is too late for purposes of section 53.103. *Id.* at 726. This is why "prudent claimants will file their lien no later than 30 days after they have finished their own work on the job site." *Id.* at 725 (internal quotation marks and citation omitted).

As long as there is legally sufficient evidence of either the work being completed or the contract being terminated on March 28, this court must uphold the trial court's conclusion and judgment that K&N's lien affidavit filed on May 15 was untimely under section 53.103 and thus invalid. *See Kazmir*, 288 S.W.3d at 562 (citing *Waggoner v. Morrow*, 932 S.W.2d 627, 631 (Tex. App.—Houston

---

[3] Without citation to any authority or the record, K&N argues that the bank required the Baldwins to notify it of any contract termination. First of all, the bank's "contract for improvements" is not the contract between the Baldwins and GSG at issue. In any event, the "contract for improvements" contains no such notice requirement with regard to either completion of the work or contract termination. At most, the Baldwins agreed to file, "upon completion of the improvements," an affidavit of completion under section 53.106 of the Property Code—but only upon the bank's request. *Cf.* TEX. PROP. CODE. ANN. § 53.106(a) (West 2007) ("An owner *may* file with the county clerk of the county in which the property is located an affidavit of completion." (emphasis added)).

[14th Dist.] 1996, no writ)). Here, the trial court found that the clock started running for purposes of both completion of work and termination of the contract on March 28, 2009; that K&N filed its lien affidavit on May 15; and that May 15 was more than 30 days after March 28. Reviewing the evidence in the light most favorable to the challenged finding and indulging every reasonable inference that would support it, we conclude that reasonable and fair-minded people could find that GSG's work was completed or that the original contract between the Baldwins and GSG was terminated on March 28, and that May 15, 2009, is more than 30 days after March 28. Therefore, we overrule K&N's first and third issues.[4]

## B. K&N's second issue

We construe K&N's second issue to complain of the legal sufficiency[5] to

---

[4] At the very end of its first issue, K&N also argues that regardless of whether K&N timely met the 30-day filing period under section 53.103, it was entitled to full payment under a separate subchapter of the Property Code governing "trapped funds." This subchapter enables a claimant to "trap" remaining funds payable to the original contractor; that is, if the owner pays any money to the original contractor after receiving suitable statutory notice of lack of payment from the claimant, the owner's property will be subject to a lien to the extent of the money paid. *See* TEX. PROP. CODE ANN. §§ 53.081, 53.084 (West 2007); *Stolz v. Honeycutt*, 42 S.W.3d 305, 311 (Tex. App.—Houston [14th Dist.] 2001, no pet.). K&N does not contend that the Baldwins directly paid any remaining money to GSG due under the contract after receiving proper notice. Instead, without any supporting authority or record citation, K&N asserts the Baldwins' paying the unpaid subcontractors that agreed to accept their pro rata share of the retained funds "is the same as paying GSG." K&N has waived this argument due to inadequate briefing. *See Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 410 (Tex. 1997) ("[O]rdinarily failure to brief an argument waives the claimed error."), *superseded on other grounds by statute as stated in Gen. Servs. Comm'n v. Little–Tex Insulation Co.*, 39 S.W.3d 591, 593 (Tex. 2001). But, even if the complaint had not been waived, we could not agree that paying subcontractors from retained funds equates to paying the original contractor for purposes of the Code's trapping provisions. K&N does not contradict the evidence that the bank withheld (slightly more than) 10% of the contract price as retainage, later released into escrow for the benefit of the unpaid subcontractors, and that GSG was not paid any of the retained $111,102. Further, K&N's owner admitted that if no subcontractor filed a timely lien, "it would be up to the homeowner just to pay who she wanted to" out of the "retainage money."

[5] In its arguments under this issue, K&N employs the phrases "only evidence" and "no evidence." And, again, K&N only requests relief in the form of reversal and rendering of judgment in its favor. Thus, K&N attacks the legal, and not the factual sufficiency, of the

12

support the trial court's finding that the Baldwins had proven their special damages, and thus were entitled to a judgment against K&N for damages in the amount of $11,141. The trial court issued a specific finding of fact that "[t]he Baldwins have paid $11,141.00 in interest charges that they would not have incurred but for the lien placed on the residence by K&N." Based on this finding, the trial court concluded that the Baldwins were entitled to "judgment against K&N in the amount of $11,141.00 for the wrongful lien of the Baldwins' real property." Without citing any authority, K&N argues that the trial court "simpl[y] signed the findings of fact submitted by the [Baldwins] in this matter" without sufficient support for actual damages in the record. We disagree.

Here, Mrs. Baldwin testified that the bank "wanted to call the [construction] loan" and threatened to foreclose on the property. Mrs. Baldwin also testified that because of the lien that K&N placed on the property, she was unable to obtain refinancing. Mrs. Baldwin further testified that K&N refused to release the lien, even after she told K&N's owner, Edward Bajorek, why she needed it released. Mrs. Baldwin testified that she approached her mortgage broker, received a quote on, and then applied for a conventional mortgage, but K&N's lien "popped up" and "stopped us." The interest rate on the original construction financing was 5.75%; if the Baldwins had been able to refinance, the rate would have dropped to 4.789%. This resulted in a higher note payment of approximately $1000 per month. The Baldwins "aggressively" attempted to refinance for approximately 16 months, which, according to Mrs. Baldwin, resulted in damages totaling $11,141. K&N points this court to no evidence in contravention of this direct testimony, but instead essentially argues that to find damages, the trial court would have had to believe Mrs. Baldwin's lies.

evidence supporting the trial court's damages finding. *See supra* n.1.

In a slander-of-title action, a plaintiff must prove that special damages were sustained. *Williams v. Jennings*, 755 S.W.2d 874, 884 (Tex. App.—Houston [14th Dist.] 1988, writ denied) (citation omitted). "Special damages are those damages proximately, naturally and reasonably resulting from the alleged slander." *Id.* (citation omitted). The plaintiff must prove the loss of a specific sale, *i.e.*, that a pending transaction was defeated by the slander. *Id.* (citing *A.H. Belo Corp. v. Sanders*, 632 S.W.2d 145, 146 (Tex. 1982)). Contrary to K&N's incorrect assertion that "[t]here was no evidence of a rejection from refinancing or what a new interest rate may have been" and "no evidence of any attempt to refinance," the record contains probative evidence in the form of Mrs. Baldwin's direct testimony tending to demonstrate the loss of a specific, applied-for mortgage transaction that was defeated by the discovery of K&N's invalid lien. *See id.* (upholding finding of actual damages in slander-of-title action where appellee provided sole testimony regarding loss of bonus payments and loss of royalty provisions due to invalid mineral lease) (citing *Sanders*, 632 S.W.2d at 146). The trial court as sole fact finder was reasonably entitled to credit and weigh Mrs. Baldwin's testimony. *See Kazmir*, 288 S.W.3d at 561.

Thus, reviewing the evidence in the light most favorable to the challenged damages finding, crediting favorable evidence if a reasonable fact finder could, and finding no contrary evidence for a reasonable fact finder to disregard, we conclude that fair-minded people could find the Baldwins suffered actual damages from K&N's invalid lien in the amount of $11,141. Therefore, because the evidence is legally sufficient to support the trial court's damages award, we overrule K&N's second issue.

## V.    CONCLUSION

Accordingly, having overruled all of K&N's issues on appeal, we affirm the

14

judgment of the trial court.

/s/     Tracy Christopher
        Justice


Panel consists of Justices Frost, Christopher, and Jamison.