REVISED JUNE 27, 2003

United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 1, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-20755
_____

In The Matter Of:    WATERPOINT INTERNATIONAL LLC

Debtor

--------------------------------

EXCHANGER CONTRACTORS INC

Appellant

v.

COMERICA BANK-TEXAS; WATERPOINT INTERNATIONAL LLC; ROBBYE
WALDRON, Chapter 7 Trustee

Appellees

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

Before KING, Chief Judge, and DAVIS, Circuit Judge, and VANCE,
District Judge.[*]

KING, Chief Judge:

Exchanger Contractors Inc., a subcontractor, was not paid by

its contractor, Waterpoint International LLC, for labor performed

by the subcontractor.  In response, Exchanger Contractors sought a

_____

[*]    United States District Judge Sarah S. Vance of the
Eastern District of Louisiana, sitting by designation.

1

declaration regarding its rights (pursuant to trust fund provisions of the Texas Property Code) to a portion of the receivable owing to the contractor by the property owner. The contractor's lender, who holds a security interest in the contractor's receivable from the owner, countered. Because the trust fund provisions under which Exchanger Contractors claims relief explicitly exempt banks and other lenders from their reach, we affirm the district court's final order upholding the bankruptcy court's summary judgment in favor of the lender.

## I.

### FACTUAL AND PROCEDURAL HISTORY

In 1997, the debtor, Waterpoint International LLC ("Waterpoint"), a construction contractor, executed a promissory note payable to its lender, Comerica Bank-Texas ("Comerica"). Pursuant to this note and the contemporaneously-signed security agreement, Comerica acquired a valid security interest in Waterpoint's accounts receivable. Comerica duly perfected its security interest in these accounts receivable.

Sometime before February 2000, Waterpoint contracted with Exxon Mobil Corporation ("Exxon") to construct certain improvements to specific real property owned by Exxon. Waterpoint subcontracted some of the labor necessary to complete the Exxon project to Exchanger Contractors Inc. ("Exchanger"). Invoices document labor performed by Exchanger for the benefit of Waterpoint totaling

2

$71,878.45. However, Exchanger made no effort to comply with the notice and filing provisions for perfecting a mechanic's lien under the Texas Property Code (the "Code").

On July 5, 2000, before paying Exchanger for the labor performed on the Exxon project, Waterpoint filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. At this time, Exxon still had, in its hands, money due Waterpoint for the improvements to its real property.

On January 9, 2001, after seeking relief from the automatic stay provisions of the Bankruptcy Code, Exchanger filed a declaratory action in state court, seeking an adjudication of its right to a portion of the funds owed Waterpoint by Exxon. Claiming it was a core proceeding related to the administration of Waterpoint's estate, Comerica removed the action to federal bankruptcy court pursuant to 28 U.S.C. § 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure. The bankruptcy court thereafter preserved Exchanger's claim for $71,878.45 of the Waterpoint receivable, but authorized all of Waterpoint's accounts receivable to be paid to Comerica so that Exxon could be dismissed from the action. The bankruptcy court then granted summary judgment in favor of Comerica. This final order was affirmed by the district court. Exchanger timely appeals the district court's order.

**II.**

3

## STANDARD OF REVIEW

On appeal in a bankruptcy case, we review <u>de novo</u> the bankruptcy court's decision to grant summary judgment in favor of Comerica. See <u>Mercer v. Mercer (In re Mercer)</u>, 246 F.3d 391, 402 (5th Cir. 2001) (en banc).

## III.

## COMPETING CLAIMS TO THE WATERPOINT RECEIVABLE

Exchanger's declaratory judgment complaint requested that the bankruptcy court "adjudicate its rights to receivables owing by Exxon . . . to Waterpoint International, LLC upon which Comerica Bank-Texas claims a security interest and to which [Exchanger] claims a prior right by reason of Section 162 of the Property Code." Comerica countered that Exchanger has no valid claim to a portion of the receivable because banks and other lenders are specifically exempted (under § 162.004 of the Code) from the Chapter 162 trust fund provisions under which Exchanger claims relief. In support of this argument, Comerica proffered to the bankruptcy court the plain language of § 162.004 of the Code and a Texas Supreme Court case interpreting § 162.004 clearly to except banks and other lenders from the trust fund provisions of the Code. See <u>Republicbank Dallas, N.A. v. Interkal, Inc.</u>, 691 S.W.2d 605 (Tex. 1985). In response, Exchanger argued that in 1989, the Texas Legislature amended § 53.151 of the Code specifically to overrule <u>Interkal</u> in favor of increased protection for subcontractors

4

regarding funds held in trust for their benefit.

To address the competing claims to a portion of the Waterpoint receivable, we start with an overview of the relevant sections of the Code as they relate to construction contracts.

**A.    Enforcing Rights under the Texas Property Code**

Exchanger roots its claim to a portion of the funds owed to Waterpoint (in which Comerica claims a security interest) to the trust fund provisions of the Code found in Chapter 162. See TEX. PROP. CODE §§ 162.001-033 (Vernon 1995 & Supp. 2003).  However, it relies on a provision in the chapter on mechanic's and materialman's liens, Chapter 53, to support this claim.  See id. § 53.151.  A basic understanding of the underlying framework and purpose behind both chapters is thus helpful.

*(1)  Chapter 53 of the Texas Property Code*

The mechanic's lien appeared in Texas in 1839 when the Congress of the Republic enacted "[a]n Act for the Relief of Master Builders and Mechanics of Texas."  Eldon L. Youngblood, Mechanics' and Materialmen's Liens in Texas, 26 SW. L. J. 665, 665 (1972).  The purpose of the mechanic's lien is to secure payment for those who furnish labor or materials in connection with the construction of improvements to real property to the extent of the increased value of those improvements to the owner's property.  Jeffrey A. Leonard & Darren G. Woody, Texas Mechanic's and Materialman's Liens and the Scope of the Preferential Lien on Removables, 15 TEX. TECH L. REV.

673, 674 (1984). In 1869, the right to a mechanic's lien, even for derivative claimants (e.g., subcontractors, mechanics or materialmen who have not contracted directly with the owner of the property to be improved), also became a constitutional right in Texas. W. MICHAEL BAGGETT & BRIAN THOMPSON MORRIS, TEXAS PRACTICE GUIDE, Ch. 10:118 (2003). Article 16, Section 37, of the Texas Constitution now provides that "mechanics, artisans and materialmen of every class, shall have a lien upon the buildings and articles made or repaired by them for the value of their labor done thereon, or material furnished therefor . . . ." TEX. CONST. art. XVI, § 37.

However, as interpreted by the Texas Supreme Court, while the constitutional right to a mechanic's or materialman's lien is broad, the Texas Constitution creates a "self-executing" lien in favor of only original or general contractors (those who contract directly with the property owner or its agent), not derivative claimants. See, e.g., First Nat'l Bank v. Lyon-Gray Lumber Co., 217 S.W. 133, 135-36 (Tex. 1919). Persons not contracting directly with the owner do not have a "self-executing" lien. See Cabintree, Inc. v. Schneider, 728 S.W.2d 395, 396 (Tex. App.–Houston [1st Dist.] 1986, writ ref'd). Instead, they must comply with the statutory lien perfection requirements to be able to enforce their rights to payment or, if necessary, foreclosure against the owner and his property. See Thermo Tech, Inc. v. Goodyear Tire & Rubber Co., 643 F.2d 1173, 1178 (5th Cir. Unit A 1981); First Nat'l Bank v. Sledge, 653 S.W.2d 283, 285 (Tex. 1983) ("Because a

6

subcontractor is a derivative claimant and, unlike a contractor, has no constitutional, common law, or contractual lien on the property of the owner, a subcontractor's lien rights are totally dependent on compliance with statutes authorizing the lien."); Hayek v. W. Steel Co., 478 S.W.2d 786, 790 (Tex. 1972).

Chapter 53 of the Texas Property Code, entitled "Mechanic's, Contractor's, or Materialman's Lien" and formerly known as the Hardeman Act, controls the procedures for perfecting liens and the relative priority of these liens once perfected. The Chapter is divided into ten subchapters ranging from general lien provisions and provisions relating to persons entitled to liens (subchapters A and B) to procedures for perfecting liens (subchapter C), schemes for funds being retained or withheld by owners for the benefit of claimants (subchapters D and E), procedures for determining priorities and preferences (subchapter F), procedures related to the release of liens and foreclosure of mechanics' liens (subchapter G), and procedures related to bonds and liens in the public works context (subchapters H, I and J). In general, the chapter deals with relationships between a general contractor, the owner of the real property and derivative claimants. See, e.g., Scarborough v. Victoria Bank & Trust Co., 250 S.W.2d 918, 922-23 (Tex. App.–San Antonio 1952, writ ref'd). It sets out procedures for connecting a derivative claimant to the owner in order to give the owner notice of the derivative claimant's claim to money still in the owner's hands. See id.; see also Youngblood, supra, at 676

7

("In Texas, unlike many states, only an original contractor enjoys a direct lien on the property; the subcontractor must rely on his statutory rights to collect funds due from the owner to his contractor. Consequently, once the owner has paid the full price to his original contractor, if he has complied with the statutes for doing so, no subcontractor can subject his property to a lien.").

While several of the provisions in Chapter 53 concern procedures for foreclosing a mechanic's lien on real property or improvements, it is clear from the framework of Chapter 53 that a mechanic's lien and the necessary steps a subcontractor must perform to perfect this lien have to do with real property and foreclosure secondarily and the trapping and retainage of funds for the benefit of derivative claimants primarily. See First Nat'l Bank, 217 S.W. at 134; Gordon-Jones Const. Co. v. Welder, 201 S.W. 681, 684 (Tex. App. – San Antonio 1918, writ ref'd) (stating that, while subcontractors "have no privity with the owner, whose obligation is solely to the contractor," they are "given a method for [first] impounding funds payable by the owner to the contractor" and then, if necessary, taking the owner's property). As provided by Chapter 53, if notice is given to the owner by the derivative claimant and the derivative claimant's lien is perfected, the owner is liable to the derivative claimant and the owner's property is subject to a statutory lien to the extent the owner should have withheld funds from the original contractor under

8

the trapping provisions of the Texas Property Code (§ 53.081) and the general retainage provisions of the Texas Property Code (§§ 53.101-53.105). See Page v. Structural Wood Components Inc., 102 S.W.3d 720, 721 (Tex. 2003) (stating that "Chapter 53 of the Property Code permits a construction subcontractor to claim a lien on funds retained by the owner" only if the subcontractor complies with the notice and filing provisions in Chapter 53); Sledge, 653 S.W.2d at 286 (discussing the "two methods by which a subcontractor can perfect a lien in the owner's property" as (1) trapping and (2) retainage); TDInds. v. NCNB Tex. Nat'l Bank, 837 S.W.2d 270, 272 (Tex. App.–Eastland 1992, no writ); see also 18 WILLIAM V. DORSANEO III, TEXAS LITIGATION GUIDE § 271.02 (2002). Thus, in contrast to an original contractor, a subcontractor does not have an ability to enforce any right to funds owed a contractor by an owner if the subcontractor does not comply with the notice and filing provisions for perfection of his lien under the Code. See Pac. Indem. Co. v. Bowles & Edens Supply Co., 290 S.W.2d 353, 357 (Tex. App. – Dallas 1956, writ ref'd n.r.e.) (stating that mechanics' liens "are incipient or inchoate until completed or perfected by compliance with the statute, and are lost utterly if those acts required for their completion be not done in the manner and within the time required by statute") (quoting Ball v. Davis, 18 S.W.2d 1063, 1064 (1929)); see also DORSANEO, supra, at § 271.02 ("Perfecting a lien is a vital step in gaining almost all of the protection available under the laws governing mechanic's and materialmen's liens. This

9

is true even though the ultimate relief sought may not involve a lien on the property.").

In 1983, the Texas Legislature replaced the Hardeman Act with the Code. In so doing, it made clear that a subcontractor's ability to enforce his lien rights under Chapter 53 requires compliance with the lien perfection provisions in Chapter 53. For example, before this 1983 codification, article 5464 of the Texas Revised Civil Statutes (part of the Hardeman Act) provided that "all subcontractors, laborers and materialmen . . . have preference over other creditors of the principal contractor or builder." TEX. REV. CIV. STAT. ANN. art. 5464 (Vernon 1958)(repealed 1983) (current version at TEX. PROP. CODE § 53.121 (Vernon 1995 & Supp. 2003)). In Lebo v. Dochen, 310 S.W.2d 715 (Tex. App.–Austin 1958, writ ref'd n.r.e.), certain mechanics and materialmen who had contracted with a general contractor to perform a portion of the labor and to provide a portion of the materials in the construction of a filling station sought funds owed to the contractor from owners of the real property on which the filling station was located. Id. at 719. One materialman argued that he should be afforded a preference over other creditors under article 5464 regardless of whether he complied with the provisions for lien perfection. Id. at 720. He maintained that the preference rights afforded materialmen under article 5464 did not require compliance with the statutes on lien perfection because article 5464 did not say as much. Id. The court rejected this argument, stating that "Art. 5464 provides a

10

preference only for subcontractors, laborers and materialmen who have liens . . . The Act deals exclusively with liens. It does not purportedly put mechanics, etc. in a preferred class of creditors except as they may comply with the procedure for establishing a lien." Id. To clarify that its intentions were in accord with the Lebo court's ruling, the 68th Legislature codified article 5464 (now § 53.121 under the Code) to state that the preference addressed in article 5464 exists only to those persons who hold a mechanic's lien. See TEX. PROP. CODE § 53.121 revisor's note (Vernon 1995 & Supp. 2003) ("The revised law adds the qualification that the preference exists only as to those persons with a mechanic's lien in order to avoid having the reader assume this section grants a general preference without regard to a lien. The addition is in conformity with the interpretation of this section in Lebo v. Dochen.").

*(2) Chapter 162 of the Texas Property Code*

In contrast to the notice and filing requirements found in Chapter 53 of the Code, Chapter 162 of the Code, entitled "Construction Payments, Loan Receipts, and Misapplication of Trust Funds," provides that construction payments made to a contractor, subcontractor, or to an officer, director, or agent of a subcontractor or contractor pursuant to a construction contract for the improvement of specific real property are deemed to be trust funds held for the benefit of laborers without regard to the

11

laborer's compliance with the procedural requirements under Chapter 53. See McCoy v. Nelson Util. Serv., Inc., 736 S.W.2d 160, 164 (Tex. App.–Tyler 1987, writ ref'd n.r.e.). Specifically, § 162.001 states that:

> An artisan, laborer, mechanic, contractor, subcontractor or materialman who labors or furnishes labor or material for the construction or repair of an improvement on specific real property in this state is a beneficiary of any trust funds paid or received in connection with the improvement.

TEX. PROP. CODE § 162.001. This provision was enacted to serve as a special protection for subcontractors and materialmen in situations where contractors or their assignees refused to pay the subcontractor or materialman for labor and materials. See McCoy, 736 S.W.2d at 164. The Code imposes fiduciary responsibilities on contractors to ensure that subcontractors, mechanics and materialmen are paid for work completed. The misapplication of these trust funds is a criminal offense under the Code. See TEX. PROP. CODE §§ 162.031-032 (Vernon 1995 & Supp. 2003).

However, § 162.004 clearly states that the provisions of Chapter 162 do not apply to a "bank" or "other lender," such as Comerica.[1] In Republicbank Dallas, N.A. v. Interkal, Inc., 691

---

[1] Section 162.004 states, in relevant part, that:
(a) This chapter does not apply to:
    (1) a bank, savings and loan, or other lender;
    (2) a title company or other closing agent; or
    (3) a corporate surety who issues a payment bond covering the contract for the construction or repair of the improvement.

S.W.2d 605 (Tex. 1985), a bank which held a security interest in a contractor's accounts receivable brought an action against a materialman claiming it had a superior right to funds held by the contractor. Id. at 606. The materialman, who had furnished the bleachers and stage equipment for the contractor to construct gymnasium facilities for various schools, argued that he was entitled to the funds because the contractor held them in trust for his benefit. Id. Looking to the plain language of the Code, the Texas Supreme Court disagreed. Id. at 607. Instead, it interpreted § 162.004 as plainly stating that the trust fund provisions of the Code do not apply to banks in any situation. Id.

Section 162.004 was codified in 1983 and amended in 1987, after the Interkal case. However, as seen from the plain language of the provision and as interpreted by the Texas Attorney General in an Opinion issued in 1988, § 162.004, as amended in 1987, retains the exemption for banks and other lenders from the trust fund provisions of the Code. See Op. Tex. Att'y Gen. No. JM-945 (1988). Further, several of the trust fund provisions contained in Chapter 162 underwent substantial modifications in 1997. See TEX. PROP. CODE §§ 162.001, .005, .006, .007, .032 cmt. (Vernon Supp. 1997). However no changes were made to § 162.004.

**B.    Consideration of Exchanger's Argument**

With this framework in mind, we address Exchanger's argument.

---

TEX. PROP. CODE § 162.004.

It contends that "[f]our years after the injustice of the <u>Interkal</u> decision (light speed for a legislature), the Texas legislature enacted § 53.151 of the Texas Property Code . . . effectively [to] reverse[] <u>Interkal</u> by providing that a creditor may not execute on trust fund money owed to a contractor or subcontractor."  For several reasons, we cannot agree.

First, Exchanger's effort to frame legislative conduct regarding § 53.151 as responsive to <u>Interkal</u> is not persuasive. Section 53.151 was not "enacted" in 1987; indeed, its roots stem from Acts of 1889.  TEX. REV. CIV. STAT. ANN. Art. 5466 cmt. (Vernon 1958).  As stated, in 1983, the Texas Legislature replaced the Hardeman Act with the Code.  Section 53.151 under this new Code, entitled "Relinquishment Following Contract Compliance; Garnishment of Money Due Original Contractor," stated, in full, that:

> (a)  When the debt is paid under the contract for construction, the party for whose interest the contract was recorded shall enter a relinquishment showing full compliance with the contract to the extent of all money due the party from the original contractor on account of labor done or material furnished.
> (b)  <u>A creditor may not garnish the money due the original contractor from the owner to the prejudice of the subcontractors</u>, mechanics, laborers, or materialmen.

TEX. PROP. CODE § 53.151 (Vernon 1983) (emphasis added).  This codification of former article 5466 of the Hardeman Act did not substantively change the rights afforded materialmen and subcontractors under the Hardeman Act.  <u>See</u> Tex. S.B. 748, 78th

14

Leg., R.S. (1983) ("An ACT relating to adoption of <u>nonsubstantive</u> revision of the statutes relating to property.") (emphasis added). The former article 5466, entitled "Relinquishment entered," had provided that:

> When the debt is paid under the contract for such building or improvements, the party for whose interest the contract was recorded shall enter a relinquishment showing a full compliance of said contract to the extent of all money due them from the original contractor or builder on account of labor done or material furnished; and <u>the money due said original contractor or builder from the person owning or having improvements made shall not be garnished by other creditors to the prejudice of such sub-contractors</u>, mechanics, laborers or material men.

TEX. CIV. STAT. ANN. art. 5466 (Vernon 1958) (repealed 1983) (current version at TEX. PROP. CODE § 53.151 (Vernon 1995 & Supp. 2003)) (emphasis added). Section 53.151 was itself amended in 1989. Under its new title, "Enforcement of Remedies Against Money Due Original Contractor or Subcontractor," the provision now states that:

> (a) A creditor of an original contractor may not collect, enforce a security interest against, garnish, or levy execution on the money due the original contractor or the contractor's surety from the owner, and a creditor of a subcontractor may not collect, enforce a security interest against, garnish, or levy execution on the money due the subcontractor, to the prejudice of the subcontractors, mechanics, laborers, materialmen, or their sureties.
>
> (b) A surety issuing a payment bond or performance bond in connection with the improvements has a priority claim over other creditors of its principal to contract funds to the extent of any loss it suffers

15

or incurs. That priority does not excuse the surety from paying any obligations that it may have under its payment bonds.

TEX. PROP. CODE § 53.151 (Vernon 1995 & Supp. 2003).

Comparing the 1983 and the current versions of § 53.151, it is clear that while the 1989 amendments did add the phrase "and a creditor of a subcontractor may not collect, enforce a security interest against, garnish, or levy execution on the money due the subcontractor" (emphasis added) to the 1983 version of § 53.151, this additional phrase does not support Exchanger's argument. Even if we assume that § 53.151 speaks to funds held in trust for the benefit of a subcontractor or a materialman (as argued by Exchanger), the part of § 53.151 that would have been helpful to the materialman in Interkal and would be helpful to Exchanger here was a part of § 53.151 in 1983 and when Interkal was decided in 1985. Indeed, it was a part of article 5466 of the Hardeman Act. The phrase stating that "[a] creditor of an original contractor may not . . . garnish . . . the money due the original contractor . . . from the owner . . . to the prejudice of the subcontractors," is simply not new. Exchanger's argument that § 53.151 was amended to overrule Interkal is thus difficult for us to accept.

Additionally, the framework of the Code belies Exchanger's contentions regarding the relationship between § 53.151 and Chapter 162. To accept Exchanger's argument that § 53.151 was meant to address funds held in trust for the benefit of subcontractors, we

16

must creatively (and, we think, incorrectly) bridge Chapter 53 and Chapter 162. Although both Chapter 53 and Chapter 162 (and their respective antecedents) are designed to protect mechanics and materialmen, the focus of each chapter is different. Chapter 53 controls procedures for perfecting mechanics' and materialmen's liens, steps required to trap money (for the benefit of derivative claimants) in the hands of the owner, procedures to alert an owner that it should retain funds for the benefit of a derivative claimant, and procedures for foreclosing a lien. In contrast, Chapter 162 addresses the fiduciary duties of persons holding funds in trust for the benefit of derivative claimants. The chapters address different situations.

The upshot of Exchanger's argument is that § 53.151 precludes a creditor of a contractor from ever collecting the proceeds of an account receivable in which the creditor has a security interest when the owner has not first ensured that all derivative claimants – regardless of their compliance with the provisions on lien perfection – have been paid by the contractor. However, if it were this easy for a subcontractor to trap a general contractor's receivable, there would be no need for the elaborate trapping and retention schemes found in Chapter 53. These provisions are designed to protect those subcontractors and materialmen who provide adequate notice to the owner of their presence and their rights to funds owed the contractor. Indeed, the Code even contemplates a procedure to protect subcontractors and materialmen

17

from "sham contract" situations – e.g., where owners use an alter ego original contractor in order to avoid being in privity with the persons who actually perform the labor or provide the material for the project. See TEX. PROP. CODE § 53.026 (Vernon 1995 & Supp. 2003). The effect of the "sham contract" provision is to place subcontractors in direct privity with the owner (as an original contractor would have been) for the purposes of the mechanic's lien statutes. See Da-Col Paint Mfg. v. Am. Indem. Co., 517 S.W.2d 270, 273 (Tex. 1974). Under Exchanger's argument, these provisions would be rendered a nullity, for there is no need for "sham contract" provisions if no action can ever be taken with regard to money owed a contractor by a creditor to the prejudice of a subcontractor, regardless of the subcontractor's compliance with the notice and filing provisions of Chapter 53.

The courts interpreting article 5466, the predecessor to § 53.151, demonstrate the presumption (at least under article 5466) that a derivative claimant must comply with the lien perfection procedures in order to assert rights to funds held by the owner. See, e.g., Youngstown Sheet & Tube Co. v. Lucey Prod. Co., 403 F.2d 135, 142 (5th Cir. 1968) (discussing (under the Hardeman Act) the need for proof of a materialman's compliance with the procedures for lien perfection before liens can affix to an account receivable of a debtor); Crutcher, Rolfs & Cummings, Inc. v. Big Three Welding Equip. Co., 224 S.W.2d 884 (Tex. Civ. App.–Galveston 1949), rev'd on other grounds, 229 S.W.2d 600 (Tex. 1950) (discussing article

18

5466 as referring to only funds subjected to mechanics' and materialmen's liens); see also Baumann v. Cibolo Lumber Co., 226 S.W.2d 210, 212 (Tex. Civ. App.–San Antonio 1950, no writ) (same). These cases further persuade us to reject Exchanger's argument that § 53.151 was meant to overrule Interkal as inconsistent with the framework and function of Chapters 53 and 162.

When faced with a situation where it could not go after funds in the hands of Exxon directly (because it was not in contractual privity with Exxon and failed to comply with the notice and filing provisions of Chapter 53), Exchanger crafted an argument to "trap" the Waterpoint receivable still in the hands of Exxon (as envisioned in Chapter 53) without complying with the notice and filing procedures for perfecting a lien under Chapter 53. While perhaps rich in creativity, we find the argument lacking in merit.

## CONCLUSION

Exchanger's claim for relief is clearly based on the trust fund provisions in Chapter 162 of the Code. However, the trust fund provisions clearly exempt banks and other lenders from their reach, and Exchanger's argument that § 53.151 of Chapter 53 of the Code somehow repealed this exemption in the trust fund provisions is without merit. We therefore AFFIRM the judgment of the district court, which in turn affirmed the judgment of the bankruptcy court.

19